**SHAW v. EASTERN TRANSP. CO. et al.**

**THE RUTH SHAW.**

**No. A–16262.**

District Court, E. D. New York.

Oct. 7, 1943.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for libelant.

John R. Stewart, of New York City, (Christopher E. Heckman, of New York City, of counsel), for Eastern Transp. Co.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Card Towing Line, Inc.

BYERS, District Judge.

The seagoing barge Ruth Shaw, being lightly laden with riprap, filled and sank in the Atlantic Ocean off Jones Inlet about 1 a. m. on November 11, 1939. She was in tow of the tug Rowen Card, and in this cause her owner seeks recovery for the loss, from the tug's owner, and the charterer, Eastern Transportation Company.

The faults specified against the tug are:

(a) Continued navigation in rough waters off Fire Island Inlet, when it was known that the barge could not pass through, in that the tug circled around offshore in dangerous seas instead of returning to Red Hook Flats.

(b) The use of hawsers of inadequate length. As to this, the evidence wholly fails.

The tow was made up of the tug and the two barges Ruth and Bernice (Shaw) in New York Bay on November 10, 1939, bound for Fire Island Inlet, through which the barges were to be taken separately, by a local tug, and moored so as to admit of discharge of the riprap for construction work going forward on the bay side of Fire Island.

The short hawsers were lengthened at the proper time, so that there were 200 fathoms separating the tug and the Bernice, and 125 fathoms between the latter and the Ruth.

On the way to destination the tug learned via radio phone that there was insufficient depth of water in the inlet, at the then low tide, to justify the effort to bring the barges through; the tug was asked to delay her arrival off the inlet, until it might appear that the barges could be safely handled by the local tug.

The tow arrived about 11 a. m. and, because there was no change in conditions, the tug circled around offshore, heading south, and made two circles of about five miles in circumference, arriving off the inlet from the second one at about 2:30 p. m.

It was still impossible for the local tug to come out and perform her mission, so the tow headed back for New York, moving slowly in the hope that the desired purpose could yet be attained before the close of day; that is, the tow might be summoned back to the inlet, and the barges be taken through during daylight hours. The tow moved leisurely then toward New York, and as darkness fell it became apparent that there would be no summons to return, and the speed was increased to about 2 miles an hour, in the expectation that the run back to the Red Hook Flats would be safely accomplished. About 11 p. m. the Ruth lost her rudder, and thereafter began to fill; in an hour or so she sank, but her crew were taken aboard a Coast Guard cutter which had been summoned by the tug when the Ruth's distress signal was made out.

The criticisms which survive the hearing have to do with the failure of the tug to realize the probable force of wind and sea promptly upon arrival off the inlet, and the hazard which would attend holding the tow in the vicinity of the inlet for the space of time actually consumed between the hour of arrival, 11 a. m., and the start of the return voyage which was at 2:30 or 3 p. m.

The sun rose red in a clear sky, and it is said that this should have taught the captain of the tug that high winds were to be expected. If that means that he should have turned back to Red Hook Flats

because the rising sun was red, the contention is not sustained by evidence in the record, and is opposed to common sense.

The Ruth was a seagoing barge, staunch and seaworthy, 198 feet long, 24 feet in beam, with 14-foot sides, and she drew 8.6 feet aft on this occasion.

Barometer readings on the Coast Guard Comanche (the rescuing vessel) at her Staten Island pier have been stipulated as follows:

| " 8 | a.m. | 30.34 |
|---|---|---|
| 11 | a.m. | 30.26 |
| Noon | | 30.22 |
| 1 | p.m. | 30.18 |
| 2 | o'clock | 30.15 |
| 3 | " | 30.12 |
| 4 | " | 30.10 |
| 5 | " | 30.11 |
| 6 | " | 30.10 |
| 7 | " | 30.06 |
| 8 | " | 30.04 |
| 9 | " | 30.01 |
| 10 | o'clock | 29.99" |

Wind directions and velocities as recorded in the Weather Bureau Station at Sandy Hook were:

| " 2 A.M. — 3 A.M. | S.W. | 10 miles per hour |
|---|---|---|
| 3 A.M. — 4 A.M. | S. | 9 " " " |
| 4 A.M. — 5 A.M. | S. | 13 " " " |
| 5 A.M. — 6 A.M. | S. | 6 " " " |
| 6 A.M. — 7 A.M. | S.W. | 8 " " " |
| 7 A.M. — 8 A.M. | S. | 7 " " " |
| 8 A.M. — 9 A.M. | S. | 12 " " " |
| 9 A.M. to 10 A.M. | S. | 12 " " " |
| 10 A.M. to 11 A.M. | S.W. | 15 " " " |
| 11 A.M. to 12 | S.W. | 16 " " " " |

From the Coast Guard Station at Fire Island, based on visual observations every four hours, the records show:

| "4 A.M. | West | Force.3 | ( 7 to 10 miles per hour) |
|---|---|---|---|
| 8 A.M. | N.E. | Force 1 | ( 1 to 2 " " " ) |
| Noon | S.W. | Force 5 | (17 to 21 " " " ) |
| 4 P.M. | S.W. | Force 5 | |
| 8 P.M. | South | Force 6 | (22 to 27 " " " )" |

Whether visual observation has any relation to anemometer readings, does not appear in the record.

■ It should be understood that Fire Island Inlet (see Shaw Ex. 2) is a difficult and capricious body of water, and that the Channel is inconstant both as to direction and depth. The local tug made half-hourly soundings on the morning of the 10th and could not find sufficient depth to insure the safe passage of barges drawing 8.6 feet, and so advised the Rowen Card. Obviously it would have been foolhardy for the local tug to go out to the tow and try to bring the barges in under such conditions. The effort would have to be made during low water, so that, in the event of grounding, the rising tide would be relied upon to float the entering vessel.

I am satisfied from the evidence that Wilson, the captain of the local tug Ideal, is experienced in these waters and would rather have towed the barges in than not; and that his suggestions that the tow remain off the inlet in the hope that ingress would be feasible before the late afternoon of November 10th were made in good faith and were justified.

As to the tentative abandonment by the tug of the effort to carry out the purpose of the venture, and the slow start on the return trip, no evidence demonstrates that this was more than a failure to correctly forecast the probable development of weather conditions and the probable depth of water in the inlet. It was by no means negligence on the part of the towing vessel, nor has testimony to the contrary been offered.

■ It is argued that the Ruth lost her rudder because of the force of the waves during the circling movements. There is no testimony that the seas were of such force that a vessel of her construction and seaworthy qualities, not fully laden, could not be expected safely to weather them. The rudder did not carry away until more than eight hours after the start was made on the return trip. This is consistent with her having successfully withstood whatever strain the circling may have imposed.

In other words, it is my opinion that the evidence is barren of any showing of negligence on the part of the towing vessel, and that the libel should be dismissed with costs.

If findings are desired, they may be settled with the decree.